UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

CASE NO. 3:26-CR-118

-v-

DEVIN LAVALLEY

Defendant.

# SENTENCING MEMORANDUM

DATED: August 14, 2026

Respectfully submitted,

ERIC K. SCHILLINGER
Federal Public Defender

By: Randi J. Bianco, Esq.
Supervisory AFPD
Bar Roll No. 507514
Clinton Exchange, 3rd Floor
4 Clinton Square
Syracuse, New York 13202
(315) 701-0080

## I. PRELIMINARY STATEMENT

On May 1, 2026, defendant Devin LaValley (hereinafter Devin) pled guilty pursuant to Fed. R. Crim. P. 11(c) (1)(C) plea agreement to two counts of Conspiracy to Sexually Exploit a Child in violation of Title 18 U.S.C § 2251(a) and (e) and one count of Distribution of Child Pornography in violation of Title 18 U.S.C § 2252A(2)(A). The government and the defense agree that a term of imprisonment of not less than 360 months or more than 480 months, a term of supervised release of life and the possibility of additional special assessment if applicable is the appropriate disposition in this case. The United States Attorney's Office and the defendant agree that, to the extent the agreed-upon disposition departs from the applicable sentencing guidelines range, that departure would be made for justifiable reasons under U.S.S.G. §6B1.2(c)(2). In particular, the specified sentence is reasonable and appropriate under the unique combination of facts and circumstances relating to the defendant, the offense of conviction, and related relevant conduct. [See Dkt.46 at p. 6 para 3; PSR ¶117].

An initial Presentence Investigation Report (hereinafter referred to as "PSR") was prepared by the United States Probation Department on July 28, 2026, in anticipation of his sentencing. The defense lodged certain factual objections to the PSR. As to the legal objections, the defense objects to the two-point enhancement in paragraph §2G**1**.2(b)(2)(A). This enhancement should not apply as McDougal digitally penetrated V-1 on her own and there was no threat of any kind made by Devin.

The PSR sets forth a total advisory offense level of 43 (after acceptance) and a Criminal History Category 1, which results in a guideline imprisonment range of 960 months [PSR ¶ 114].

The probation officer has identified the following factors as potential grounds for a sentence outside the advisory guideline system: "the defendant's experience of childhood sexual abuse; his drug or alcohol dependence; and his mental and emotional condition." [PSR ¶ 133].

If this Court sentences Devin to a guideline sentence, this would create a disparity in sentencing to others similarly situated. For example, according to information gained from U.S. Sentencing Commission JSIN database, during the last five fiscal years (FY2021-2025), there were 963 defendants whose primary guideline was §2G2.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 963 defendants (100%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 346 month(s) and the median length of imprisonment imposed was 360 month(s).

## II. THE 18 USC 3553(a) FACTORS.

In determining the particular sentence to be imposed, the Court shall consider:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) The need for the sentence imposed:

- (A) To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
- (B) To afford adequate deterrence to criminal conduct;
- (C) To protect the public from further crimes of the defendant; and
- (D) To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a).

## III. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

This offense occurred when Devin was in the throes of a severe methamphetamine addiction. He was using the drug multiple times per day, at the same time as taking

medication to treat his Attention Deficit Hyperactivity Disorder. These drugs reduced his inhibitions and caused Devin to do things he would never imagine doing otherwise. In accepting responsibility for his crimes Devin wrote, “There are no words that can undo my actions. No apology can ever alleviate the pain I have caused. Although it is little, if any, consolation, I carry the weight of my actions and their indelible impact on others. The responsibility for what I did is mine and mine alone, and I accept that. I don’t know if I can ever make amends for what I did, but I know I can try to live the rest of my life in an effort to atone for it. I have made selfish and detestable choices, and I hope that those affected by them know that they are so much more than what I did to them. Lastly, I accept the full consequences of my actions.” [PSR].

## IV. <u>DEVIN’ HISTORY AND CHARACTERISTICS</u>

### *a) Early Life Struggles*

Devin was born to a mother with mental health issues who self-medicated with marijuana and alcohol while pregnant. He was born two months prematurely and placed in an incubator because his lungs did not fully develop and one lung was collapsed. He needed to have surgery as an infant to repair his lungs. He has suffered with asthma as long as he can remember. He was also diagnosed with severe lead poisoning and underwent chelation therapy for a few months.

During his childhood he had several accidents causing head injuries. The first head injury occurred when he fell down the stairs at two years old. The second occurred when he was hit on the head with a shovel by his cousin. The third occurred when he was ten years old and fell and cracked his head on a marble coffee table. After this last incident Devin recalls immediately vomiting and having a headache.

School was difficult for Devin. When he was in kindergarten, he was first diagnosed with Attention Deficit Hyperactivity Disorder [hereinafter, "ADHD"]. He was placed on medications including Ritalin and Adderall. In addition to him having a hard time focusing, he was also a stutterer which resulted in him being bullied relentlessly. He felt very isolated as a child which was only made worse when he was sexually abused by his cousins between the ages of six and eight.

***b) Devin volunteered in his community***

Notwithstanding all the trauma Devin suffered, he always tried to help others. He joined the Boy Scouts and obtained the rank of "Eagle Scout." When he was 14 years old, he joined Cooperstown Explorer Post, which was a division of scouting which concentrated on firefighting. There, he held the ranks as secretary and captain. Thereafter, he volunteered for the Cooperstown Fire Department for four years and was a member of the Volunteer Emergency Squad where he trained for his EMT -B certification. He participated in Church and was a member of the Cooperstown Ecumenical Youth Group and helped with local community events. [See letter from Devin's father Mark LaValley; PSR ¶ 109].

***c) Education***

Devin had to work harder than his peers because of his ADHD. In high school, he participated in the science Olympiad. He graduated with a grade point average of 85.273 [See Cooperstown School Record]. His school counselor wrote a letter to the college admissions program stating how hard-working Devin was and how he grew despite his learning difficulties [See counselor letter]. After graduation he was accepted in RIT's mechanical engineering program. While at RIT he learned American Sign Language as RIT had a large deaf population. He befriended another student in a wheelchair and helped him around campus. [Letter from Mark

LaValley]. While in college Devin was still suffering from ADHD, but he also began to suffer from Depression. He then transferred to Morrisville State College and ultimately dropped out before graduating.

***d) Mental Health Issues***

Between 2008 and 2012 Devin sought psychiatric outpatient help for ADHD and Depression. His ADHD had adversely affected his interpersonal relationships and eroded his self-confidence. He felt responsible for his parents' marriage breaking up because many of their fights were over how best "to manage him." [See Basset records]. After 2012, Devin was inconsistent in taking his ADHD medication because he did not like the side effects. He began smoking marijuana to help him sleep. Then seven years ago, he began to self-medicate with methamphetamine which initially made him feel better. In 2023 Devin again sought help for depression and anxiety after a breakup with a long-term girlfriend of eleven years. He was diagnosed with adjustment disorder with mixed anxiety and depressed mood, anxiety disorder, unspecified type and ADHD and was prescribed medication. [Basset records]. He currently experiences both anxiety and depression.

***e) Substance Abuse Issues and increased hypersexuality***

Devin has a history of substance abuse which began when he was 18 years old [PSR ¶ 99]. At the time of the instant offense, Devin was taking medication for ADHD *and* using methamphetamine multiple times throughout the day – sometimes as often as every twenty minutes. The use of these drugs reduced his inhibitions and caused him to be hypersexualized. His girlfriend of five years talks about the toll his methamphetamine use took on him, and their relationship, and how impulsive he became. (See Baker letter) It is well-established that "the relationship between drug rehabilitation and crime is clear." *United States v. Perella*, 273 F.

Supp. 2d 162, 164 (D. Mass. 2003). Moreover, a District Court may consider a defendant's addiction as a mitigating factor in choosing a reasonable sentence. *See* 18 USC § 3553(a); *United States v. Garcia*, 497 F.3d 964, 972 (9th Cir. 2007).

Devin's hypersexuality, lack of impulse control, and risky sexual behavior can at least be partially attributed to a long saga of substance abuse stemming from early introduction to youth prescription drugs used to treat his ADHD. Devin's history of daily drug use emphasizes the importance of understanding the "rewarding processes of Methamphetamine and related [Amphetamine Type Stimulants] ("ATS") compounds, as they are the most commonly used medications" for youth ADHD and there are "growing concerns on the long-term risks of misuse on the development of substance abuse (Davis, Metzger, Vann, Wong, Shetty, Forster & Sumien, 2007)". Regular use that may not be classified as substance abuse in adults "might be considered abuse in youths because of the potential…to interfere with brain developmental growth and adjustment tasks (Leccese and Waldron, 1994; Newcomb and Bentler, 1989; Tarter, 2002)". Devin's diminished decision-making faculties may stem from adolescent prescription "ATS" use, punctuated by the introduction of Methamphetamine.

Devin started using Adderall and Ritalin prescription drugs at a young age for ADHD, and this persisted through adolescence and young adulthood. Although the "medical use of Amphetamine Type Stimulants [such as Adderall] can be highly effective in reducing ADHD symptomology", millions of adolescents and young adults "misuse prescription stimulants (Davis et al., 2023; supra)". Young and middle adulthood are "key age groups" which may be "most vulnerable to the adverse effects" of that misuse. *Id.*

David A. Kessler, M.D., former Dean of the Yale University School of Medicine and the former commissioner of the U.S. Food and Drug Administration… believes Ritalin is "widely

overprescribed (Beal, 1999). Doctor Kessler warns that abuse of substances like Ritalin can cause “anxiety…paranoia; and violent or reckless behavior”. *Id.* Treating an adolescent male patient who reported “poor impulse control…excessive masturbation…and significant distress related to increased sexual desire” on an Adderall prescription, a publication in the *Journal of Child and Adolescent Psychopharmacology* noted a “need for clinician awareness of the possibility that mixed amphetamine salts induce hypersexuality (Joseph & Reddy, 2017)”. Notably, the “medical use of stimulants among young adults” may “increase their vulnerability to brain biochemical changes and addictive behaviors (Davis et al., 2023; supra)”.

Studies have shown that “prior exposure to chronic ATS administration was found to produce…long-lasting behavioral and neural sensitization that further amplified rewarding drug behaviors upon subsequent exposure”. *Id.* These “psychostimulants activate the reward circuitry system of the brain” through increased dopamine levels, whose “continued activation reinforces drug use behaviors, leading to potential abuse and addiction (Davis, supra, Faraone, 2018 & Volkow et al. 2007).” This “repeated use of ATS can result in hypersensitivity to the rewarding effects” of the drug that are long-lasting and are thought to be “critical to the development of [harmful] reward-associated behaviors (Boileau et al. 2006)”. The result is “ATS” users who often engage in high-risk sexual behaviors when the central nervous system is excited.

Devin’s history of “ATS” use, which persisted into young adulthood, may have manifested a more powerful and devastating daily reliance on the use of Methamphetamines. Indeed, his girlfriend stated that his use of methamphetamine made him “very sexually motivated and he wanted to have sex all the time, and not just with me.” [See Baker letter]. Studies indicate that risk taking behaviors related to sexual activity are a prominent effect of substance abuse, and the daily use of Methamphetamine is commonly associated with a “loss of inhibitory control of

sex behavior", "sexually compulsive behavior", and "hypersexuality". (Frohmader & Bateman & Lehman & Coolen (2010); Green and Halkitis 2006; Halkitis et al. 2001; Mckirnan et al. 2001; Rawson et al. 2002)". "One potential mechanism for why dopaminergic stimulants are associated with increased sexual risk is that they increase sexual desire (Volkow et al., 2007). Individuals who use Methamphetamines report increased risk behavior while acutely intoxicated, and they report that methamphetamine enhances sexual pleasure, facilitates and prolongs sexual activity, and delays and enhances orgasms (Bang-Ping, 2009; Bolding, Hart, Sherr, & Elford, 2006; Semple, Grant, & Patterson, 2004; Semple, Zians, Grant, & Patterson, 2005, 2006; Sher, Bartholow, & Wood, 2000; Shoptaw & Reback, 2007)".

Devin needs to receive proper treatment and introduction to programs which can assist him in climbing from the depths of his substance use.

***f) Family, Community Support, involvement with church and classes he has taken post incarceration.***

Devin continues to have the love and support of his family and many friends. [See separately filed support letters]. His friend Amalthea states Devin is "trying to see the best in people, even when some of them have absolutely not deserved kindness, or have treated him poorly in return." [See letter from Amalthea Aelwyn]. Another friend Joel describes him as always helping people and he is "generous with both time and resources. [See letter from Joel Aelwyn]. Devin's girlfriend also describes incidents where Devin has gone out of his way to help strangers and that he is a caring and loving person. [See Baker letter]. Devin's aunt, a retired speech pathologist, says that Devin is "an intelligent, kind human being that has a lot of positive contributions left to make in this world" and she was shocked and surprised when she heard about the situation he is facing", this in not "the kind of person [she] has always known him to be". [ See Zielinski letter]. Strong family support will aid in Devin's rehabilitation and reintegration into the

community. *See United States v. Wachowiak*, 496 F.3d 744, 745 (7th Cir. 2007) (in possession of child porn case, where guidelines 120-151 months, below guideline sentence of 70 months imposed in part because "the guidelines failed to account for the strong family support defendant enjoyed, which would aid in his rehabilitation and re-integration into the community. Because defendant's family and friends have not shunned him despite learning of his crime, he will likely not feel compelled to remain secretive if tempted to re-offend. Rather, he will seek help and support").

In addition to family support, Devin is now sober and has gotten back to the roots of his Catholic faith which was always important to him. He attends weekly mass and bible study. He has also completed 18 courses since his incarceration including: "How Can I Heal from Child Sexual Abuse"; "Recovery Starts form Within"; "Breaking the Cycles of Self Destruction"; "PREP Domestic Violence"; "Learn Your Strengths from Shining Light" and "Secrets of the Lord's Prayer Sermon".

## V. <u>DESIGNATION RECOMMENDATION</u>

Devin is asking this Court to recommend that he be designated to FCI Otisville in Otisville, New York where he can receive treatment for sexual offenders and be close to home so his family and friends can visit him.

## VI. <u>CONCLUSION</u>

In conformity with the Sentencing Guidelines, an imposed sentence should not be greater than what is necessary to accomplish the goals outlined in 18 U.S.C. §3553. Based upon the foregoing, a sentence of 360 months plus lifetime post-release supervision would satisfy the purposes of the Sentencing Reform Act.

DATED: August 14, 2026

Eric K. Schillinger
Federal Public Defender

By: s/Randi J. Bianco, Esq.
Supervisory Ass't Federal Public Defender
Bar Roll No. 507514
Clinton Exchange, 3rd Floor
4 Clinton Street
Syracuse, New York 13202
(315) 701-0080

TO: Adrian LaRochelle, AUSA
Devin LaValley